**DAYTON HUDSON CORPORATION,**
**d/b/a Target Stores, Appellant,**

v.

**Pete ELDRIDGE, Appellee.**

**No. 05-87-00078-CV.**

Court of Appeals of Texas,
Dallas.

Dec. 1, 1987.

Rehearing Denied Jan. 11, 1988.

Linda G. Moore, Charles Michael Gray, Dallas, for appellant.

Ernest E. Figari, Jr., Donald Collelouri, Andrew G. Jubinsky, Dallas, for appellee.

Before WHITHAM, STEWART and McCLUNG, JJ.

WHITHAM, Justice.

A policeman brought this action against a corporate citizen who responded to a police request for information in apprehending a suspect. The citizen-appellant, Dayton Hudson Corporation, doing business as Target Stores, appeals from a portion of a judgment rendered on the jury's verdict in favor of the policeman-appellee, Pete Eldridge. In its sixth point of error, Target contends that the trial court erred in rendering judgment for Eldridge against Target because Target breached no duty to Eldridge as a matter of law. We agree. Moreover, we find no merit in Eldridge's claim for indemnity. Accordingly, we reverse and render.

On November 26, 1984, at about 8:30 a.m., Officer Patrick Hussy of the Plano Police Department investigated a burglary of a motor vehicle. The victim, Ms. Hatti Price, told Hussy that her car had been burglarized while parked in front of her house and that the burglar had taken certain property, including a Texas Instruments calculator, Model No. 5040 II. Price informed Hussy that she purchased the calculator at the Target store on Parker Road in Plano and that she had intended to return it to Target because it had a broken printer. Price told Hussy that the receipt for the calculator was taped to the calculator when it was stolen. Anticipating that the thief might attempt to return her calculator to Target and having been advised by Hussy that it might be two to three days before the police could process the paperwork on her report, Price told Hussy that she would go to Target herself to report that the calculator had been stolen. At approximately 9:30 a.m. that same day, Price went to the Target store on Parker Road and spoke with Ms. Marie Shoemaker, one of the employees at the customer service desk. Price advised Shoemaker

that (1) a Texas Instruments 5040 II calculator had been stolen from her car, (2) the receipt for the calculator was with it when it was stolen, and (3) she suspected the thief might try to return it. Price showed Shoemaker a cancelled check in the amount of $52.99, dated January 19, 1984, which she used to pay for the calculator and which bore her driver's license number. Attached to Price's check was a police information form she received from Hussy earlier that morning. Price also told Shoemaker that the amount of the cancelled check represented the total amount of the purchase. Price explained to Shoemaker that the receipt that was with the calculator might contain certain coding numbers, either 350/621 or 350/622, that were used in Price's business to earmark the expenditure. Upon receiving this information from Price, Shoemaker called the store's security department and spoke with Kathy Laws, the security manager. Laws was busy at the time, but she told Shoemaker to make a photocopy of the check and the police form provided by Price so that it could be posted at the customer service desk. Shoemaker did so and then wrote on the letter-size copy, "Target receipt for $52.99 will have the circled coding #'s above on it—Its for a TI 5040 II calculator." The "circled coding #'s" referred to in Shoemaker's notation (i.e., 350/622) were written on the cancelled check. Shoemaker showed this notice—consisting of the cancelled check, the police form, and her handwritten notation—to both Laws and a coworker, Katheryn Stageberg, and then posted it between the two cash registers at the customer service desk. Later that day, Hussy also visited the Target store and spoke with Laws. Hussy told Laws that a Texas Instruments 5040 II calculator, with a receipt attached, had been stolen from a vehicle. Hussy reiterated much of the information that Price had already given to Target, including the fact that the stolen calculator had a broken printer and that the receipt would have some numbers written on the top. Hussy asked Laws to call the Plano Police Department if anyone came into the store to return the calculator.

Shortly before noon on the following day, November 27, 1984, Michael Brett Corson and his family went to the Target store on Parker Road to return a calculator they purchased at Target and to shop for Christmas gifts. Upon entering the store, Corson approached the customer service desk to return the calculator while his wife and two daughters started shopping. At the customer service desk, Stageberg assisted Corson. Corson told Stageberg that he wanted to exchange a calculator that had a defective printer, and he gave her his receipt for it, along with his driver's license. Corson's calculator was also a Texas Instruments Model No. 5040 II. The receipt Corson gave Stageberg was dated June 5, 1984, and was in the amount of $90.96. After taking the calculator and receipt from Corson, Stageberg walked to the room behind the customer service desk and called security. Stageberg spoke with Leslie Jones, one of Target's security officers, and told her that a man was returning a Model 5040 II calculator and that they were supposed to inform the police. Since Jones was unfamiliar with the notice that was posted at the customer service desk, Stageberg explained it to her and told her that Corson had a "receipt with the same numbers on top." Although Stageberg denied having ever seen the written notice that was posted at the customer service desk or having explained it to Jones, her testimony was contradicted by both Jones and Shoemaker, as well as by the incident report prepared by Jones just hours afterwards. After Jones asked Stageberg if she was sure the numbers matched, and Stageberg assured her that she had checked them, Jones called the Plano Police Department and reported that someone was trying to return a calculator that matched the one Target had been notified to watch out for.

In response to Jones' telephone call, the Plano Police Department dispatched Eldridge to the Target store. The police dispatcher advised Eldridge that a burglary suspect was returning stolen property. While Eldridge was en route to the store, Eldridge spoke with Hussy by radio, and Hussy gave him some background information about the stolen calculator. When Eldridge arrived at the store, Jones approached Eldridge, identifying herself as a Target security officer. Eldridge asked Jones what she had, and Jones identified Corson and stated that he was returning a stolen item at the customer service desk. When Eldridge asked how Jones knew it was stolen, Jones told him that Target had information from the Plano Police Department in the form of a notice of some type. Jones told Eldridge that Target had the returned calculator and receipts and that the numbers matched with the stolen calculator. Based on the information that he received from Jones, whom, as a Target security officer, he believed to be a credible person, Eldridge approached Corson, informed him that he was a suspect in a burglary, and placed him under arrest. In this connection, Eldridge testified that if Jones had told him only that Corson was returning a Texas Instruments 5040 II calculator with a broken printer, he would not have placed Corson under arrest on the basis of that information alone. After handcuffing Corson, Eldridge asked Jones if a private area was available to them, and Jones led them to the security office. Once there, Eldridge unhandcuffed Corson and asked Jones to get the calculator and receipts that they had as evidence. Jones returned with those items, and, several minutes later, Eldridge also received the notice that had been posted at the customer service desk. Eldridge compared the information on the notice with the receipt Corson had presented and concluded that they did not match up and that Corson had been misidentified as a burglary suspect by Target. Eldridge noted, among other things, that both the date and the amount of Corson's receipt were different than the cancelled check that Price had provided to Target. Eldridge released Corson from custody and informed the acting store manager of the mistake.

Corson brought this action against Eldridge and Target claiming that he was falsely imprisoned. Thereafter, Eldridge filed a cross-claim against Target, seeking indemnity and recovery of the attorney's

fees that he was forced to incur in the defense of the claim asserted against him by Corson. Target likewise filed its own cross-claim against Eldridge for contribution or indemnity. The trial court submitted the case to the jury on special issues. The jury found that Target, but not Eldridge, was liable for falsely imprisoning Corson. Moreover, the jury found (1) that Target failed to convey, or failed to accurately convey, all of the relevant information it had about Corson to Eldridge; (2) that such failure was negligence; (3) that Target's negligence was the proximate cause of the arrest of Corson; and (4) that Eldridge arrested Corson solely as a natural and proximate consequence of the conduct of Target. The jury also found that Corson was entitled to actual damages in the sum of $25,000.00. The jury found that a reasonable and necessary attorneys' fee for the services rendered to Eldridge by his attorneys was (1) $20,000.00 in the trial court, (2) $10,000.00 in the event of an appeal to the Court of Appeals, and (3) $5,000.00 in the event of an appeal to the Texas Supreme Court. Based on the jury's findings, the trial court rendered judgment awarding Corson and Eldridge their damages as found by the jury and denied Target any relief on its cross-claim against Eldridge.

In answer to special issue number three, the jury found that Target failed to convey all of the relevant information it knew, or failed to convey accurately the relevant information it knew, to Eldridge regarding Corson on the occasion in question. In answer to special issue number eight, the jury found that Eldridge arrested Corson on the occasion in question solely as a natural and proximate consequence of the conduct of Target. Under its sixth point of error, Target argues that Target owed no duty to Eldridge as a matter of law and that Eldridge has no cause of action against it. Moreover, Target insists that there is no evidence that Target breached a duty to Eldridge. Thus, Target maintains that since Target did not commit a tort against Eldridge, as a matter of law a judgment cannot be rendered in favor of Eldridge against Target.

## Duty

At no time did Target ask or direct Eldridge to arrest Corson, nor did any Target employee tell Eldridge how to handle the situation. The undisputed evidence shows that on November 27, 1984, Corson was not detained by Target, but rather by Eldridge. Prior to the arrival of Eldridge at the Target store, Corson testified that he was not detained by any Target employee and that he was free to walk away from the customer service desk. Clearly, Corson could have left the store at any time prior to being handcuffed and detained by Eldridge. Eldridge testified that Jones did not tell or request him to arrest Corson. Jones pointed Corson out to Eldridge, and Eldridge approached Corson and made the determination to handcuff Corson. At Eldridge's request, Jones led Eldridge, Corson and Officer Hussy to the Target security office so that the officers could continue their investigation. Eldridge and Hussy detained Corson in the Target security office for about fifteen minutes, and then they released him. Thus, we reach the question of the nature of the duty owed the police by a citizen attempting to comply with a police request for information leading to the apprehension of a person committing a criminal offense. Here, the police sought information from Target in order to locate the person stealing from Price a Texas Instruments Model No. 5040 II calculator with a broken printer. Target acted to provide that information.

With this background we turn to consider whether Target owed a duty to Eldridge. In the context of the present case, we must determine whether Target had a duty to Eldridge to convey all the relevant information it knew or to convey accurately the relevant information it knew. A duty is an obligation to perform some act. *Taylor v. White*, 113 S.W. 554, 556 (Tex.Civ.App. 1908, no writ). In the field of negligence, "duty" signifies conformance to the legal standard of reasonable conduct in the light of apparent risk; the essential question is whether the plaintiff's interests are entitled to legal protection against the defend-

ant's conduct. *Wytupeck v. City of Camden*, 25 N.J. 450, 136 A.2d 887, 893 (1957). In negligence law, "duty" is nothing more than a set of policy considerations which lead the law to say that the particular plaintiff is entitled to protection. *See Keenan v. Smith*, 149 Cal.App.3d 576, 197 Cal.Rptr. 32, 35 (Ct.App.1983). In negligence law, "duty" is simply an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *Brennan v. City of Eugene*, 285 Or. 401, 591 P.2d 719, 722 (1979). The concept of "duty" is simply a shorthand way of expressing whether the plaintiff's interests are entitled to protection against the defendant's conduct. *Earp v. Nobmann*, 122 Cal.App.3d 270, 175 Cal.Rptr. 767, 778 (Ct. App.1981). Legal "duty" is an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *See Johnson v. County of Los Angeles*, 143 Cal.App.3d 298, 191 Cal.Rptr. 704, 709–10 (Ct.App.1983). "Duty" is a conclusory statement which reflects the sum total of policy considerations which leads the law to say a particular plaintiff is entitled to protection against a specific harm. *Bartell v. Palos Verdes Peninsula School District*, 83 Cal.App.3d 492, 147 Cal.Rptr. 898, 901 (Ct.App.1978). "Duty" must be distinguished from "authority"; the term "duty" denotes an obligation and is compulsory while "authority" denotes capacity and is permissive. *See Kerrigan v. Errett*, 256 N.W.2d 394, 399 (Iowa 1977). The common law test of "duty" is the probability or the foreseeability of injury to the plaintiff. *Vogt v. Johnson*, 278 Minn. 153, 153 N.W. 2d 247, 251 (1967). In negligence cases, the "duty" is to conform to the legal standard of reasonable conduct in light of the apparent risk. *Karrar v. Board of Road Commissioners of Barry*, 127 Mich.App. 821, 339 N.W.2d 653, 657 (Ct.App.1983). "Duty" refers to an affirmative obligation imposed by law to do a particular thing, to perform a particular act; it is a requirement of specific conduct. *Walker v. Bignell*, 100 Wis.2d 256, 301 N.W.2d 447, 452 (1981). A "duty" is an obligation imposed by law which requires one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. *Ortiz v. City of Chicago*, 79 Ill. App.3d 902, 35 Ill.Dec. 57, 62, 398 N.E.2d 1007, 1012 (App.Ct.1979). A "duty" is an obligation imposed by the law upon a person which requires that a person conform to a certain standard of conduct for the protection of another against an unreasonable risk. *Laflin v. Estate of Mills*, 53 Ill.App.3d 29, 10 Ill.Dec. 927, 931, 368 N.E. 2d 522, 526 (App.Ct.1977). The question of "duty," the legal obligation imposed upon one for the benefit of another, is a question of law to be determined by the court. *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill.2d 552, 328 N.E.2d 538, 540 (1975). A "duty" in negligence law is an obligation imposed by the law upon a person which requires that person to conform to a certain standard of conduct for the protection of another against an unreasonable risk. The determination of the question of duty, whether the parties stood in such a relationship to one another that the law will impose upon one an obligation of reasonable conduct for the other's benefit, is an issue of law to be resolved by the court. *Walsh v. A.D. Conner, Inc.*, 99 Ill.App.3d 427, 54 Ill.Dec. 936, 939, 425 N.E.2d 1153, 1156 (App.Ct.1981). "Duty" indicates a mandatory obligation to perform. *See Huey v. King*, 220 Tenn. 189, 415 S.W.2d 136, 138 (1967). "Duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff. *Kay v. Ludwick*, 87 Ill.App.2d 114, 230 N.E.2d 494, 497 (App.Ct. 1967). A "duty" is an obligation recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks. *Samson v. Saginaw Professional Building., Inc.*, 44 Mich.App. 658, 205 N.W.2d 833, 835 (Ct.App.1973), *aff'd*, 393 Mich. 393, 224 N.W.2d 843 (1975).

From these cases, we glean that "duty" is a question of law to be determined by the court, that "duty" indicates a mandatory obligation to protect a particular plaintiff, that "duty" suggests foreseeability of injury to the plaintiff, that "duty" acts to protect another against an unreasonable

risk and that policy considerations lead the law to say that a particular plaintiff is entitled to protection against a specific harm caused by a specific defendant. Quoting Prosser, one of our sister courts of appeal put the matter of duty this way:

A preeminent scholar-philosopher in the tort field said:

" * * * [T]he problem of duty is as broad as the whole law of negligence, and * * * no universal test for it ever has been formulated * * *. It is imbedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that duty * * * is not sacrosanct in itself but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. * * * [N]o better general statement can be made, than that the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists."

William L. Prosser, Law of Torts, Sec. 53, 3d Ed. 1964.

*Childs v. Greenville Hospital Authority*, 479 S.W.2d 399, 401–02 (Tex.Civ.App.— Texarkana 1972, writ ref'd n.r.e.).

■ Guided by these principles, we decline to impose upon Target the duty to undertake the entire criminal investigation necessary to determine if the person presenting a Texas Instruments Model No. 5040 II calculator with a broken printer is, indeed, the person sought by the police for committing a criminal offense. Indeed, we conclude that the emphasis Eldridge places on full attention by Target of the minute details of the information in Target's possession could result in failure to apprehend the person who stole Price's calculator. Assume that the culprit removed the all-important receipt from the calculator before attempting return of the calculator to Target and sought orally to persuade Target that the calculator had been purchased at Target. In that case, with Target's attention focused upon a calculator with a certain receipt attached and the amount and date of purchase showing, Target might not call the police, enabling a possible criminal to escape arrest. We fail to see how the all-important police-citizen cooperation necessary in our society can be enhanced if the citizen agreeing to cooperate is burdened with a legal duty encompassing an exacting attention to detail.

It follows, and we so hold, that Target had no duty to Eldridge to convey all the relevant information it knew or to convey accurately the relevant information it knew. Considerations of policy forbid the law to say that Eldridge is entitled to protection. *See Childs*, 479 S.W.2d at 401, quoting Prosser. We reason that the investigation necessary to connect the information provided to Target with the person presenting the defective calculator was police work—not citizens' work. "Investigation" is the process by which the police acquire the probable cause to justify the arrest and prosecution of one suspected of having committed a crime. *People v. Orr*, 26 Cal.App.3d 849, 103 Cal.Rptr. 266, 272 (Ct.App.1972). "Investigate" means the process of inquiring into or tracking down through inquiry. *Mason v. Peaslee*, 173 Cal.App.2d 587, 343 P.2d 805, 808 n. 1 (Ct.App.1959). "Investigate" means to follow up by patient inquiry or observation; to inquire and examine with systematic attention to detail and relation. *Mason v. Peaslee*, 343 P.2d at 808 n. 2.

■ In the present case, Eldridge did not obtain from Jones and examine the Corson calculator and receipts before arresting Corson. Instead, Eldridge asked Jones to get the calculator and receipts Target had in its possession and examined the calculator and receipts after he had arrested Corson. Hence, we conclude that Eldridge did not follow up by patient inquiry and inquire and examine with systematic attention to detail and relation. We conclude further that it was that failure that caused Eldridge to find himself in the courthouse, not any breach of a duty owed Eldridge by Target. In this land of freedom and liberty, with all of its concomitant constitutional rights and protections, if

we wish to have our citizen population continue to respect the authority of police personnel performing their duties in a lawful manner, *it is incumbent upon law enforcement officials to make a thorough investigation* and exercise reasonable judgment before invoking the awesome power of arrest and detention. *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1346 (7th Cir.1985). Moreover, in connection with arrests, liability should be determined on whether or not the defendant requested or directed the arrest. *J.C. Penney Company v. Reynolds,* 329 S.W.2d 104, 106 (Tex.Civ.App.—El Paso 1959, writ ref'd n.r.e.). Hence, we conclude further that the trial court erred in rendering judgment for Eldridge against Target because Target breached no duty to Eldridge as a matter of law. We sustain Target's sixth point of error. As argued, we treat Target's sixth point as a "no evidence" point. If a no evidence point is sustained, we render judgment for the appellant. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). In his sole cross-point, Eldridge contends that the trial court erred in striking his negligent misrepresentation claim against Target because Target breached its duty to Eldridge by failing to accurately convey to him all of the information it had about Corson. We have held that Target had no such duty. Hence, we overrule Eldridge's cross-point.

### Eldridge's Claim for Indemnity

In his cross-claim, Eldridge sought to recover from Target the attorneys' fees incurred in defending against Corson's claim. Eldridge contended that he was a "wholly innocent party" who was brought into this action solely as a result of the tortious conduct of Target and that he was, therefore, entitled to judgment over and against Target, the culpable party, for any recovery against him, as well as for his expenses of litigation. Thus, in essence, Eldridge urges a species of indemnity. Hence, Eldridge insists that after the return of the jury's verdict, which wholly exonerated Eldridge and found that Target's tortious conduct was the sole and proximate cause of the arrest of Corson, the trial court correctly rendered judgment in Eldridge's favor against Target for the reasonable attorneys' fees found by the jury.

We conclude, however, that the jury's verdict is not dispositive of the question of whether Eldridge was a wholly innocent party who was brought into this action solely as a result of Target's conduct. The undisputed evidence reflects that Eldridge was brought into this action as the result of Target's attempt to comply with a police request for information leading to the apprehension of a person committing a criminal offense. Here, the police sought information from Target in order to locate the person stealing from Price a Texas Instruments calculator, Model No. 5040 II, with a broken printer. Target acted to provide that information when it called the police. Consequently, we conclude that Eldridge was not a wholly innocent party. Instead, we conclude that Eldridge was brought into this action as a result of police efforts to arrest a person committing a criminal offense. Indeed, in the final analysis, Eldridge came into this action as a result of his failure to make a thorough investigation before invoking the awesome power of arrest and detention. *See Moore,* 754 F.2d at 1346. Therefore, in the present case, Eldridge is not an innocent party forced to incur costs and expenses, including attorneys' fees, to be treated as the legal consequences of some original wrongful act of another and permitted to be recovered as damages. *See Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 839 (Tex.App.—Eastland 1984, no writ). (Ball, the innocent party, plugged an oil and gas well pursuant to his contract with the operator of the well. However, the operator failed to notify Ball that the well had been assigned and that the plugging contract was, therefore, terminated. The new lessee then sued the operator and Ball for trespass and conversion.) Since Eldridge is not a wholly innocent party, we find no merit in his claim for indemnity.

Reversed and rendered.